# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

———————————

Nº 07-CV-1337 (JFB) (ETB)

———————————

## DR. LEVI MCINTYRE,

Plaintiff,

VERSUS

## LONGWOOD CENTRAL SCHOOL DISTRICT, DR. ALLAN GERSTENLAUR, MIDDLE ISLAND ADMINISTRATORS ASSOCIATION, AND KATHLEEN BRENNAN,

Defendants.

———————————

**MEMORANDUM AND ORDER**
September 30, 2009

———————————

JOSEPH F. BIANCO, District Judge:

Plaintiff Dr. Levi McIntyre ("McIntyre" or "plaintiff") brings this action against defendants Longwood Central School District ("LCSD" or "the district"), Dr. Allan Gerstenlauer ("Gerstenlauer"), Middle Island Administrators Association ("MIAA") and Kathleen Brennan ("Brennan"), (collectively, "defendants"), alleging violations of his rights under federal and New York State law. Specifically, McIntyre asserts the following federal law claims: (1) discrimination based on race and gender in violation of his rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"); (2) retaliation for filing a complaint in 2004 under Title VII with the Equal Employment Opportunity Commission ("EEOC"); (3) discrimination based on his age in violation of the Federal Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.*

("ADEA"); and (4) violations of his civil rights, pursuant to 42 U.S.C. §§ 1981 and 1983 and the Equal Protection Clause of the United States Constitution.[1] Specifically, plaintiff, who is a 61-year-old African-American male and has been a junior high school principal in LCSD for over fifteen years, contends that he has been denied the same equal base salary increases as other similarly situated administrators in the LCSD and MIAA because of his race, gender, or age and/or as retaliation for filing a complaint with the EEOC in October 2004.

Defendants LCSD and Gerstenlauer

———————————

[1] This Court previously dismissed the state law claim against the MIAA defendants under Section 296(1)(a) of the New York State Human Rights Law. *See McIntyre v. Longwood Cent. Sch. Dist.*, No. 07-CV-1337 (JFB) (ETB), 2008 WL 850263, at *13 (E.D.N.Y. Mar. 27, 2008).

(hereinafter, "the LCSD defendants") and defendants MIAA and Brennan (hereinafter, "the MIAA defendants") move by respective motions for summary judgment in their favor on all of plaintiff's claims. For the reasons set forth below, defendants' motions for summary judgment are granted, and the complaint is dismissed in its entirety. In particular, it is undisputed that plaintiff's salary was approximately $141,000 in 2005-06, approximately $148,000 in 2006-07, approximately $155,000 in 2007-08, and approximately $160,000 in 2008-09. Moreover, at the time of the CBA negotiations, he was the 13th highest paid junior high/middle school principal in all of Suffolk County and the highest paid member of the MIAA. In fact, plaintiff's salary in 2005-06 as a junior high school principal was higher than that of an assistant superintendent in the school district. Although plaintiff contends that his rate of salary increase over the life of the CBA (approximately 17 percent) compared to the increases received by other MIAA members provides evidence of discriminatory intent (based on gender, age and/or race) and retaliation, it is further undisputed that, *inter alia*, under the CBA, (1) the only other person with a salary almost as high as plaintiff's was a white female, who also received an approximately 17 percent increase; (2) with the exception of the high school principal who runs one of the largest high schools in Suffolk County (with 3,000 students) and who was hired after the CBA was negotiated, plaintiff remains the highest paid MIAA employee for the lifetime of the present CBA; (3) a black male assistant principal received a percentage pay increase of 43.5%, which was at the highest level; and (4) three of the other four black members of the MIAA received the top or near the top raises. Moreover, defendants have articulated a non-discriminatory basis for the salary structure in the CBA – namely, the desire to raise the salaries of the majority of the LCSD school administrators who, unlike plaintiff, ranked among the bottom in salary for their respective positions when compared to other administrators in Suffolk County, while giving a lower percentage increase to the higher-paid senior administrators (such as plaintiff) whose salaries were already equaling or surpassing those of senior management, including assistant superintendents. In short, plaintiff has simply presented no evidence, statistical or otherwise, that could support an inference of retaliation or discrimination based on race, age, or gender in the negotiation and execution of this CBA by the defendants. Accordingly, for this reason and the other grounds set forth herein, summary judgment is warranted on all claims.

## I. BACKGROUND

### A. Facts

The following facts are taken from the parties' depositions, declarations, exhibits and respective Local 56.1 statements of facts.[2] Upon consideration of a motion for summary judgment, the Court construes the facts in the light most favorable to plaintiff, the non-moving party. *See Capobianco v. City of N.Y.*, 422 F.3d 47, 50 n.1 (2d Cir. 2005).

### 1. Plaintiff's Position at LCSD

Plaintiff, who is 61 years-old, became the principal of Longwood Junior High School in 1993, where he remains to date. (LCSD defendants' 56.1 statement ("LCSD Def.'s

---

[2] Where only one party's 56.1 statement is cited, the fact is not contested by the other party or the other party has offered no evidence to controvert that fact.

56.1") ¶¶ 1-2.) Plaintiff took a $3,000 pay cut to work in LCSD, where his annual salary was approximately $84,000 when he began working in the district. (Plaintiff's counterstatement to LCSD Def.'s 56.1 ("Pl.'s LCSD 56.1") ¶ 3.) Plaintiff became a member of MIAA in 1993, when he started work at the LCSD. (LCSD Def.'s 56.1 ¶ 4.) Plaintiff's salary for 2006-07, including a longevity payment of $2,000, was $148,948, and plaintiff's 2007-08 salary, including a longevity payment of $2,000, was $155,576. (MIAA defendants 56.1 statement ("MIAA Def.'s 56.1") ¶ 32-34.) Plaintiff's 2008-09 salary, including a longevity payment of $2,000 and travel allowance of $750, was $160,314. (MIAA Def.'s 56.1 ¶ 35.)

## 2. The MIAA

MIAA is an unincorporated association consisting of 34 public school administrators from the LCSD. (MIAA Def.'s 56.1 ¶ 1.) MIAA's membership is comprised of principals, assistant principals, and directors. (MIAA Def.'s 56.1 ¶ 2.) Directors and principals are at the same management level. (MIAA Def.'s 56.1 ¶ 61.) Plaintiff was the highest paid member of the MIAA in 2005-2006 and 2006-2007. (Pl.'s LCSD 56.1 ¶ 14; MIAA Def.'s 56.1 ¶ 30.) Plaintiff is the only junior high school principal in the LCSD. (LCSD Def.'s 56.1 ¶ 32; Brennan Dep., at 43.)

Plaintiff claims that MIAA is affiliated with the Council of Administrators and Supervisors ("CAS"). (Pl.'s MIAA 56.1 ¶ 3.) CAS is an unincorporated association that provides legal and negotiating services to approximately 1,400 public school administrators on Long Island and does not represent, or attempt to represent, any employee or person other than Long Island administrators. (MIAA Def.'s 56.1 ¶¶ 4-6.) CAS is not affiliated with the AFL-CIO. (MIAA Def.'s 56.1 ¶ 8.) According to plaintiff, CAS is affiliated with Empire State Supervisors and Administrators Associations ("ESSAA"), which is a New York state-wide union of over 3,500 members that represents administrators on Long Island representing 72 bargaining units in Nassau and Suffolk counties, and that MIAA enjoys the benefits of belonging to CAS and ESSAA. (Plaintiff's Counterstatement to the MIAA defendants' 56.1 ("Pl.'s MIAA 56.1") ¶ 3.) Further, plaintiff claims that ESSAA is affiliated with the ROSOL insurance agency, 1-800 Flowers, Davis Optical, AVIS Worldwide, and other short and long term group life insurance companies. (Pl.'s MIAA 56.1 ¶ 3.)

In the past, MIAA has successfully filed a salary greivance on behalf of plaintiff, regarding a contract during the 1993-94 period, which indicated a higher pay amount than plaintiff had received. (Pl.'s MIAA 56.1 ¶ 60.)

## 3. Plaintiff's EEOC Complaint

Plaintiff filed a complaint with the EEOC in October 2004 (hereinafter, "the EEOC complaint"). (LCSD Def.'s 56.1 ¶ 10.) Plaintiff testified that numerous incidents regarding former Superintendent Dr. Candee Swensen ("Swensen") led to his filing of this complaint. (Pl.'s LCSD 56.1 ¶¶ 8-9.) Prior to filing the EEOC complaint, plaintiff sent a letter outlining his concerns to Swensen and sent a copy of the letter to MIAA. (Pl.'s LCSD 56.1 ¶ 8.) Plaintiff accused Swensen of being racist. (LCSD Def.'s 56.1 ¶ 9; Pl.'s LCSD 56.1 ¶ 9.) Swensen retired in 2005, and Gerstenlauer, an assistant superintendent under Swenson, has been superintendent of LCSD since 2005. (LCSD Def.'s 56.1 ¶ 12;

Pl.'s LCSD 56.1 ¶¶ 33, 46.)

After filing the EEOC complaint in 2004, plaintiff does not recall whether anybody else in the school district gave him any problems regarding age, gender, and race discrimination until the time of the 2006 CBA agreement. (LCSD Def.'s 56.1 ¶¶ 11, 13; Pl.'s LCSD 56.1 ¶¶ 11, 13.) When the EEOC complaint was filed, plaintiff called his MIAA attorney and had a meeting with Swenson with the attorney present but "did not have issues with the union doing nothing." (Pl.'s MIAA ¶ 56.1 58; Pl.'s LCSD 56.1 ¶ 8.) Plaintiff testified that he did, however, have problems regarding a 2005 letter issued by Brennan regarding attendance and provided information to the deputy superintendent proving that the information in that letter was incorrect. (Pl.'s LCSD 56.1 ¶ 11.) Plaintiff also testified that, in 2005, he filed a grievance for being denied a "right to attend a conference on sexual harassment." (Pl.'s LCSD 56.1 ¶ 11.) He also ran for the school board in Brentwood and filed a petition. (Pl.'s LCSD 56.1 ¶ 11.) Around November 2006, plaintiff had a meeting with Ms. Watkins, an assistant superintendent, and a follow-up meeting, where Ms. Watkins gave plaintiff a letter stating that it was inappropriate and unprofessional for plaintiff to have raised an issue of a teacher being denied attendance at a conference during a meeting held with the superintendent, another assistant superintendent, and junior high school assistant principals. (Pl.'s LCSD 56.1 ¶ 13; Pl.'s Ex. O; McIntyre Dep., at 116-20.)

### 4. The CBA

The collective bargaining agreement that was negotiated between the MIAA and LCSD for the years 2006-2011 is the subject of this litigation ("the CBA" or "2006-11 CBA").

The CBA is comprised of a 12-step salary schedule that was agreed upon after negotiation. (LCSD Def.'s 56.1 ¶ 41.)

In all previous contracts negotiated since plaintiff's employment at LCSD, all MIAA members were treated as one in the bargaining unit and awarded the same percentage salary increase from year to year, as evidenced in the prior 2002-2006 contract; however, the CBA departed from past practice and gave 32 members of the bargaining unit salary increases ranging from 27-37 percent, while plaintiff received a 17 percent increase. (Pl.'s LCSD 56.1 ¶¶ 24, 46.) 82 percent of the MIAA membership received over 30 percent salary increases, and approximately 12 percent received increases ranging from 27-29 percent over the life of the CBA. (Pl.'s LCSD 56.1 ¶ 24.) Under the terms of the CBA, plaintiff received the lowest salary percentage increase as compared to the other MIAA members. (Pl.'s LCSD 56.1 ¶ 24.)

The only person who received a similar increase as that of plaintiff was the MIAA president, Brennan. (Pl.'s LCSD 56.1 ¶ 24.) Both plaintiff and Brennan were placed in "Step 12" under the CBA when the CBA was signed. (LCSD Def.'s 56.1 ¶ 18.) Plaintiff was the highest paid member of the MIAA, and Brennan, who was the second highest paid member, made $10,000 less than plaintiff during the 2005-06 period. (Pl.'s LCSD 56.1 ¶ 16.) Plaintiff was the most senior MIAA member (fourteen years) and the only member with a doctorate degree. (Pl.'s LCSD 56.1 ¶ 25.) Brennan starting working in the LCSD in 1973 and was the Director of Elementary Education from December 1999 until her retirement in June 2007, and she was the president of the MIAA from 1996 to 2006. (Pl.'s LCSD 56.1 ¶ 27; LCSD Def.'s 56.1 ¶ 29.) Brennan's yearly salary was

4

approximately $137,000 when she retired. (Pl.'s LCSD 56.1 ¶28.) However, Brennan submitted her retirement documents approximately six months after the CBA was signed, and plaintiff is the only current MIAA member in Step 12. (Pl.'s LCSD 56.1 ¶ 18.) Plaintiff alleges that Brennan was not impacted by the contract because she was compensated in the summer. (Pl.'s LCSD 56.1 ¶ 24.)

Of the seven principals who were members of the MIAA when the CBA was signed, plaintiff was the only male. (Pl.'s LCSD 56.1 ¶ 19.) The only other black male member of the MIAA, an assistant principal at the middle school level, who is younger than plaintiff and less experienced, received a 43.5 percentage increase in pay, which was at the highest level of increases. (LCSD Def.'s 56.1 ¶ 22; Pl.'s LCSD 56.1 ¶ 22; MIAA Def.'s Ex. 10.) It is undisputed that no other black members of the MIAA ever indicated to plaintiff that they felt that they were discriminated against by the CBA Agreement. (LCSD Def.'s 56.1 ¶ 21.)

Plaintiff attests that he was in a category of "secondary principals" in previous contracts, as shown by the salary contracts schedule from 1993-2000, but has since been removed and placed in a separate category, even though there is another secondary principal, Mr. Murphy, who is in his third year of principalship of Longwood High School and has a salary that exceeds that of plaintiff. (Pl.'s LCSD 56.1 ¶¶ 35, 46.) It is undisputed that Murphy was not a member of MIAA when the CBA was negotiated. (MIAA Def.'s 56.1 ¶ 40.) In 2001, the ninth grade was removed from the junior high school and placed with the high school, adding approximately 750 more students to the high school, and Murphy, as the Longwood high school principal, oversees one of the largest high schools in Suffolk County with over 3,000 students. (MIAA Def.'s 56.1 ¶¶ 41, 43.) Plaintiff alleges that Murphy is a newly hired, white male secondary principal with no doctorate degree who is paid more than plaintiff, although there is no difference in terms of responsibilities between his post as a junior high school principal and Mr. Murphy's, as high school principal, and that, in the past, a principal from a high school was transferred to the junior high and then back to the high school. (Pl.'s LCSD 56.1 ¶¶ 35, 46; Pl.'s MIAA 56.1 ¶ 40.) Further, secondary assistant principals for the junior high and high schools remain on the same salary schedule and have been transferred between buildings. (Pl.'s LCSD 56.1 ¶ 35.) In prior contracts, plaintiff claims that a group entitled "secondary principals" included both the junior high school and high school principals, which included plaintiff and Mr. Bozza. (Pl.'s LCSD 56.1 ¶ 35; McIntyre Aff. ¶ 7.) Plaintiff alleges that MIAA thereafter separated plaintiff and Mr. Bozza, who was the MIAA vice president at that time and a high school principal, into two groups and negotiated a side agreement for him in 2001 prior to his retirement, whereby he was given additional compensation. (Pl.'s LCSD 56.1 ¶ 35; McIntyre Aff. ¶ 7.)

The CBA salary schedule was created around the parameters of the existing salary range contained in the 2003-06 CBA. (MIAA Def.'s 56.1 ¶ 25.) Plaintiff had a 2005-06 salary of $141,296, which was outside the salary range for secondary principal contained in the 2003-06 CBA, which was $103,000 to $128,000. (MIAA Def.'s 56.1 ¶¶ 26, 27.) Brennan's salary in 2005-06 of $131,612 was also outside the existing director salary range, which was $93,000 to $118,000, and both plaintiff and Brennan were placed on the top

step of their respective salary columns. (MIAA Def.'s 56.1 ¶¶ 28-29.) In the CBA, newly hired employees were put on a salary scale commensurate with the salary at the job that they left, but that salary would not exceed those of employees who were in the same position in the LCSD. (LCSD Def.'s 56.1 ¶ 35.) Gerstenlauer testified that an existing employee would go up one step for each additional year of experience under the CBA until they reach the top step. (Pl.'s LCSD 56.1 ¶ 36; LCSD Def.'s ¶ 37.) Once an employee reached Step 12, the final step, they receive a percentage increase that was negotiated in the CBA. (Pl.'s LCSD 56.1 ¶ 38.)

At the time that the CBA Agreement was negotiated, plaintiff testified that he had no problems with the members of the MIAA negotiating team. (Pl.'s LCSD 56.1 ¶ 15.) Plaintiff did, however, have problems with Brennan, the MIAA president, whom plaintiff believed held hostility toward plaintiff because plaintiff had questioned her leadership of the MIAA. (Pl.'s LCSD 56.1 ¶ 15.) Plaintiff has never been involved in the negotiations of any CBAs between MIAA and LCSD and did not participate in the 2006-11 CBA negotiations. (MIAA Def.'s 56.1 ¶¶ 36-37.) The undisputed members of MIAA's negotiating team were Pat Allen, a 56-year-old woman and the chief negotiator, Wynstelle Nicholson, a 62-year-old black female principal, Mark Sidman, a white male, and Kevin McCarthy, a white male. (MIAA Def.'s 56.1 ¶¶ 10-12.) Brennan's involvement in the negotiations, however, is disputed. Plaintiff has no knowledge whether Brennan negotiated the CBA and no knowledge whether Brennan was present for negotiations. (LCSD Def.'s 56.1 ¶ 17; MIAA Def.'s 56.1 ¶¶ 37-38.) Brennan selected the negotiating team and testified that she reviewed the CBA

before it was signed, that there were changes made to the contract prior to signing, and, that pursuant to the bylaws of the association, the negotiations of the MIAA contracts are one of the affairs of the association, which she has a duty to supervise. (Pl.'s LCSD 56.1 ¶ 30.) Plaintiff also attests that he was present for a meeting in September 2005 during which MIAA members gave Brennan suggestions with respect to the CBA. (McIntyre Aff. ¶ 4.) Gerstenlauer was a member of the LCSD negotiating team. (MIAA Def.'s 56.1 ¶ 19.) Gerstenlauer testified, however, that he never discussed the CBA during negotiations with Brennan. (Gerstenlauer Dep., at 45.) Plaintiff also testified that Watkins was involved in the negotiations, although he does not know in what manner she participated. (Pl.'s MIAA 56.1 ¶ 10; McIntyre Dep., at 128-29.)

The parties also dispute whether neighboring districts had similar step programs with pay caps. (Pl.'s LCSD 56.1 ¶ 40; LCSD Def.'s 56.1 ¶¶ 40, 42.) Gerstenlauer testified that the MIAA and LCSD entered into a 12-step structure that departed from prior contracts because of a recognition on their parts of a dire need to fix a salary scale that resulted in extraordinarily low salaries for most administrators in the LCSD. (LCSD Def.'s 56.1 ¶ 44.) Gerstenlauer also testified that in negotiating the CBA, the LCSD wanted fewer steps so that salaries would not press against those of senior management. (LCSD Def.'s 56.1 ¶ 43.) Assistant superintendent salaries for 2005-06 were $130,000, $145,000, and $145,000. (MIAA Def.'s 56.1 ¶ 51.) The MIAA had proposed a 15-step salary schedule that was rejected by the LCSD. (MIAA Def.'s 56.1 ¶ 45.) Plaintiff, however, alleges that the change in salary structure was a form of retaliation by the defendants. (Pl.'s LCSD 56.1 ¶¶ 43-44.)

Referenced in the negotiations was an analysis of the salaries of administrators in Suffolk County, compiled by Eastern Suffolk BOCES for 2005-06, which revealed that most LCSD administrators were on the lower end of the scale and, in some cases, at the very bottom of any administrator's salary scale. (MIAA Def.'s 56.1 ¶ 21; LCSD Def.'s 56.1 ¶ 45.) Starting salaries at the LCSD were static, and there was disproportion between salaries relative to responsibilities. (LCSD Def.'s 56.1 ¶ 45.) The BOCES survey showed that the majority of Longwood administrators – a group made up of blacks, whites, Hispanics, and male and female administrators – were ranked among the bottom of their respective positions, although plaintiff alleges that the survey does not take into account characteristics such as the size and demographics of a school. (MIAA Def.'s 56.1 ¶¶ 22, 24; Pl.'s MIAA 56.1 ¶ 22.) Plaintiff's 2005-06 salary ranked him the 13th highest out of 52 junior high school principals. (MIAA Def.'s 56.1 ¶ 23.) The lowest paid junior high principal for 2005 was Longwood's middle school principal, who was a newly hired employee with no prior experience as a principal. (Pl.'s MIAA 56.1 ¶ 54.) The Longwood elementary principals' 2005 salaries ranked 116th, 121st, 121st, and 155th out of 158 in the county. (MIAA Def.'s 56.1 ¶ 52.) In 2005, the six lowest paid assistant principals for elementary schools were all Longwood administrators. (MIAA Def.'s 56.1 ¶ 55.) However, all of these employees had one year in the district and, in that position, except for one employee, who had 2 years in both. (Pl.'s MIAA 56.1 ¶ 22.) In 2005, LCSD's high school assistant principals' salaries ranked 88th, 102nd, 102nd, 102nd, 102nd, and 109th out of 110 total in the county. (MIAA Def.'s 56.1 ¶ 56.)

Gerstenlauer sent plaintiff a memo stating the reason for the salary structure in the CBA. (Pl.'s LCSD 56.1 ¶ 23.) However, plaintiff alleges that Gerstenlauer's reasons may not be truthful and alleges that Gerstenlauer had selected a lateral assistant principal position in another district, following his employment as an assistant principal under plaintiff from 1993-1997, because he did not want to work for a black principal. (Pl.'s LCSD 56.1 ¶ 23.)

B. Procedural History

Plaintiff first filed a complaint with the EEOC in October of 2004. Although plaintiff received a "Right to Sue" letter, plaintiff did not pursue that right in federal court.

Plaintiff filed another complaint with the EEOC on January 5, 2007. The EEOC issued plaintiff a "Right to Sue" letter on January 22, 2007. Plaintiff brought suit *pro se* and *in forma pauperis* in this Court on March 29, 2007, although he is now represented by counsel. The MIAA defendants moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) on May 18, 2007. The Court issued a Memorandum and Order on March 27, 2008, granting in part and denying in part the MIAA defendants' motion.

On October 28, 2008, the MIAA defendants moved for summary judgment on all of plaintiff's remaining claims, and on October 30, 2008, the LCSD defendants also moved for summary judgment. On February 6, 2009, plaintiff submitted his opposition to both motions. On February 27, 2009, the MIAA defendants filed their reply, and on April 7, 2009, the LCSD defendants filed their reply. On May 22, 2009, the Court heard oral argument. This matter is fully submitted.

## II. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2004). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (internal quotations omitted). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (internal quotations omitted). The Second Circuit has provided additional guidance regarding summary judgment motions in discrimination cases:

> We have sometimes noted that an extra measure of caution is merited in affirming summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions. *See, e.g. Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994). Nonetheless, "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997); *see also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive

context of discrimination cases.").

Schiano v. Quality Payroll Sys., 445 F.3d 597, 603 (2d Cir. 2006) (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001)).

## III. DISCUSSION

Defendants have moved for summary judgment on a number of grounds. First, the MIAA defendants contend that MIAA does not fall under the coverage of Title VII or the ADEA as a "labor organization" within the meaning of those statutes, and, alternatively, that plaintiff's Title VII, ADEA and § 1983 claims cannot survive summary judgment on the grounds that there is no evidence that MIAA breached its duty of fair representation to plaintiff when it negotiated the CBA. Next, the MIAA defendants also argue that defendant Brennan had no personal involvement in the negotiation of the 2006-2011 CBA and, therefore, the Section 1981 and 1983 claims against her must be dismissed. All defendants argue that plaintiff cannot adequately support his claims of (1) retaliation or discrimination based on race, age or gender to survive summary judgment on his Title VII or ADEA claims, or (2) a denial of equal protection rights under the Equal Protection Clause of the United States Constitution or 42 U.S.C. § 1981. Finally, the LCSD defendants allege that plaintiff's claims are barred by collateral estoppel because plaintiff filed a similar claim with the New York State Public Employment Relations Board ("PERB"), on the basis that the CBA was discriminatory. The Court addresses each of plaintiff's claims in turn.

## A. Title VII and ADEA Claims Against the LCSD Defendants

For the reasons set forth below, the Court finds that plaintiff has not put forth sufficient evidence to raise genuine issues of material fact on his claims of retaliation or discrimination by the LCSD defendants based on race, gender and/or age, and, therefore, plaintiff's claims pursuant to Title VII and ADEA against the LCSD defendants cannot survive summary judgment.[3]

### 1. Retaliation

The LCSD defendants contend that this claim should be dismissed because plaintiff cannot demonstrate an adverse employment action, nor can he demonstrate discriminatory animus.[4] The Court evaluates a Title VII

---

[3] The same standards apply to both ADEA and Title VII cases. *See Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003) (holding that ADEA retaliation claims are analyzed under Title VII framework). Although it is not entirely clear from the complaint whether plaintiff is also asserting state discrimination claims, the Court liberally construes the complaint to allege such claims, and the Court exercises supplemental jurisdiction over those claims, and dismisses them as well because the same standard applies to the state discrimination claims and judicial economy warrants consideration of those claims. *See Song v. Ives Labs., Inc.*, 957 F.2d 1041, 1046 (2d Cir. 1992) (relating Title VII and NYSHRL claims); *accord Jean-Louis v. N. Shore Univ. Hosp. at Plainview*, No. 06 Civ. 3023 (JFB) (ARL), 2007 WL 4409937, at *9 (E.D.N.Y. Dec. 14, 2007).

[4] The MIAA defendants argue that they are aware of no underlying complaint or other action for which plaintiff may plausibly base a claim of retaliation against them. In fact, the MIAA provided legal representation in 2002 during a meeting in which he accused Swensen of having

retaliation claim under the three-step, burden-shifting framework used for an adverse employment claim, as established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, a plaintiff must establish a *prima facie* case of retaliation by demonstrating that "(1) the employee was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action." *Gregory v. Daly*, 243 F.3d 687, 700 (2d Cir. 2001) (quoting *Reed v. A. W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996)). In determining whether a plaintiff has satisfied this initial burden, the court's role in evaluating a summary judgment request is "to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005).

---

racial motivations against him. (McIntyre Dep., at 65.) Thus, it does not appear that plaintiff is alleging a retaliation claim against the MIAA defendants. The Court therefore addresses the retaliation claim with respect to the LCSD defendants. In any event, to the extent that plaintiff alleges that Brennan retaliated against plaintiff in negotiating the CBA because he had previously questioned her leadership and raised issues regarding attendance and management decision-making, such a claim fails as a matter of law because questioning someone's leadership is not a protected activity under Title VII, and, in any event, plaintiff has not demonstrated that Brennan had any personal involvement in the negotiations to create a genuine issue of material fact, as discussed *infra*. In short, to the extent a retaliation claim is being asserted against Brennan and/or MIAA, there is no evidence to support that claim.

The burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment action and if he carries that burden, it shifts back to plaintiff to demonstrate by competent evidence that the reasons proffered by defendant were pretext for retaliatory animus based upon the protected Title VII activity. *See Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006).

### a. The "Adverse Employment Action" Requirement

The LCSD defendants argue that plaintiff's retaliation claim must be dismissed because, among other things, plaintiff cannot prove that he has suffered an adverse employment action. Specifically, their position is that plaintiff has not suffered a "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities." (MIAA Def.'s Memorandum of Law, at 12.) To satisfy the adverse action requirement, the employee must show that "a reasonable employee would have found the challenged action materially adverse." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). This means that the materially adverse employment action must discourage a reasonable employee from making or supporting a charge of discrimination. *See id.*

If plaintiff can demonstrate that he has been denied the same percentage of salary increases received by other administrators because of his race and/or gender, such denial of salary increases could constitute an "adverse employment action" under Title VII. *See, e.g.*, *Taher v. Wichita State Univ.*, 526 F. Supp. 2d 1203, 1218 (D. Kan. Dec. 7, 2007)

("Defendant argues that a salary increase does not constitute adverse action and therefore plaintiff cannot establish a prima facie case. The issue, however, is not whether plaintiff received *any* pay raise but whether he received a lesser raise than similarly situated employees of different races. Defendant has not shown that plaintiff's claim is precluded by the mere fact that he received a pay raise.") (internal citations and footnote omitted); *Somoza v. Univ. of Denver*, No. 05-cv-00355-PAC-BNB, 2006 WL 2535092, at *14 (D. Colo. Aug. 31, 2006) (noting that the elements of a Title VII disparate treatment claim and *McDonald-Douglas* burden-shifting framework applies to claims under § 1981 and stating, "[i]n the Tenth Circuit, a plaintiff may be able to show an adverse employment action for purposes of a prima facie case under § 1981 if he or she receives a smaller salary increase than other similarly-situated employees outside the protected class") (citing, *inter alia*, *Amro v. Boeing Co.*, 232 F.3d 790, 798 (10th Cir. 2000)); *Mandel v. Champion Int'l Corp.*, 361 F. Supp. 2d 320, 326 (S.D.N.Y. March 21, 2005) ("The court agrees that a denial of a pay increase, if proven, would constitute an adverse employment action.") (citing *Davis v. State Univ. of N.Y.*, 802 F.2d 638, 642 (2d Cir. 1986)). Thus, contrary to the LCSD defendants' contention, plaintiff's claim is not defeated by the fact that he was not denied a pay increase because plaintiff is entitled to argue that he received a lower increase than his similarly situated counterparts. In the instant case, the Court finds that plaintiff has put forth sufficient evidence alleging that he received a significantly lower salary increase than other members of the MIAA and thereby satisfied his burden to establish a *prima facie* case with respect to the adverse action requirement. Thus, summary judgment on this particular ground is unwarranted.

b. Causal Connection

It is well-settled that if a retaliatory motive played a part in the adverse employment actions, even if it was not the sole cause, the law is violated. *See Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990) (citing *Davis v. State Univ. of N.Y.*, 802 F.2d 638, 642 (2d Cir. 1986)); *see also De Cintio v. Westchester County Med. Ctr*, 821 F.2d 111, 116 n.8 (2d Cir. 1987). Likewise, if the employer was at all motivated by retaliatory animus, the law is violated even if there were objectively valid grounds for the adverse employment action. *Sumner*, 899 F.2d at 209. A plaintiff may establish a causal connection between the protected activity and the adverse employment action either through direct evidence of retaliatory animus, or by circumstantial evidence. *Id.* Here, plaintiff has not put forth any direct evidence of retaliatory animus and, instead, relies on circumstantial evidence.

The LCSD defendants contend that plaintiff's retaliation claim cannot survive summary judgment because plaintiff has not established a causal connection between plaintiff's 2004 EEOC complaint, alleging discrimination by the superintendent at that time, Candee Swensen, and the outcome of the salary negotiations that took place two years later. (LCSD Def.'s Memorandum of Law, at 5.) Defendants argue that "to support a prima facie case, the temporal proximity between the protected activity and the adverse employment action must be 'very close' in time." (*Id.* at 5-6 (citing *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001).)

First, it is undisputed that over a year and a half separated plaintiff's protected activity in October 2004 and the alleged retaliation in

June 2006. Plaintiff does not point to any other protected activity within that timeframe.[5] If a plaintiff is only attempting to rely on temporal proximity, although the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action[,]" *Gorman-Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 554 (2d Cir. 2001), district courts have generally concluded that "a passage of two months between the protected activity and the adverse employment action seems to be the dividing line." *Cunningham v. Consol. Edison, Inc.*, No. 03-CV-3522 (CPS), 2006 U.S. Dist. LEXIS 22482, at *55-56 (E.D.N.Y. Mar. 28, 2006) (collecting cases). However,

because the Second Circuit has found periods well beyond two months to be sufficient to suggest a causal relationship under certain circumstances, courts must carefully consider the time lapse in light of the entire record. *See, e.g.*, *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45-46 (2d Cir. 1980) (holding eight-month gap between EEOC complaint and retaliatory action suggested a causal relationship); *see also Richardson v. N.Y. Dep't of Corr. Serv.*, 180 F.3d 426, 446-47 (2d Cir. 1999) (holding abusive acts within one month of receipt of deposition notices may be retaliation for initiation of lawsuit more than one year earlier), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

In this case, not only is there a clear and undisputed lack of temporal proximity, but the Court finds that the entire record demonstrates that no causal relationship can be established between the filing of the 2004 EEOC complaint against Swensen and the allegedly retaliatory pay schedule as reflected in the CBA as a matter of law. To support his claim, plaintiff seems to suggest that Gerstenlauer previously worked under Swensen and that because plaintiff filed a complaint against Swensen's allegedly discriminatory actions in 2004, Gerstenlauer and the LCSD retaliated against plaintiff in negotiating the CBA in 2006. However, this speculation by plaintiff, regarding a rather tenuous basis for retaliation, is belied by the record. Plaintiff elected not to pursue the 2004 matter after having received a right to sue letter, and he testified that, after filing the EEOC complaint in 2004, plaintiff could not recall whether anybody else in the school district gave him any problems regarding age, gender, and race discrimination until the time of the 2006 CBA agreement. (LCSD Def.'s 56.1 ¶¶ 11, 13; Pl.'s LCSD 56.1 ¶¶ 11, 13.) Plaintiff testified

---

[5] Again, plaintiff's alleged raising of concerns about attendance at conferences and questioning of management decision-making do not constitute protected activity within the meaning of Title VII. In fact, the disciplinary memorandum issued from Watkins to plaintiff in November 2006 occurred after the CBA was negotiated and, as plaintiff concedes, was only arguably retaliation for his second EEOC complaint and not the 2004 complaint. (*See* McIntyre Dep., at 120.) Plaintiff does not argue, however, that defendants retaliated against plaintiff for filing his second EEOC complaint, which is the subject of this lawsuit. Even assuming that he did, however, the Court finds that such a disciplinary memorandum is insufficient to meet the adverse employment requirement and, in any event, there is also no evidence to establish an inference of retaliation. Finally, plaintiff's argument that he "did not have a good relationship with Brennan" (Pl.'s Opposition, at 21), also does not establish any protected activity and is insufficient to raise an inference of retaliatory motive on the part of the LCSD defendants, where there is no evidence of a conspiracy between the LCSD and MIAA defendants, as noted *infra*.

specifically that he believed the issues in his 2004 complaint were "behind [him]" after he heard news of Swensen's retirement and that nobody else in the LCSD took any action against him that he considered to be racially or gender-motivated up until Swensen's retirement. (*See* McIntyre Dep., at 95-96.) Plaintiff further testified that, after Gerstenlauer became superintendent, he had no problems with the LCSD in terms of racial or gender bias until the 2006-11 CBA was signed. (*See* McIntyre Dep., at 105-06.) It is apparent that the sole basis of plaintiff's grievance in this case is with the pay schedule in the 2006 CBA, and plaintiff has failed to create a disputed issue of material fact as to whether the 2006 CBA was related to, or in reaction to, plaintiff's 2004 EEOC complaint in any way. In short, the time lapse between the EEOC complaint and the allegedly retaliatory action is too long to create an inference of retaliation, and plaintiff has not put forth any other evidence to support such an inference. Accordingly, the Court finds that the proffered admissible evidence would be insufficient to permit a rational finder of fact to infer a retaliatory motive, and, therefore, summary judgment on this ground is warranted.

## 2. Discrimination Based on Race, Gender and/or Age

Claims of discrimination under Title VII are analyzed under the three-step, burden-shifting framework used for an adverse employment claim, as established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). "To state a prima facie case of intentional discrimination in compensation, the plaintiff [must] establish that (1) she belongs to a protected class; (2) she received low wages; (3) similarly situated comparators outside the protected class received higher compensation; and (4) she was qualified to receive the higher wage." *Edmondson v. Bd. of Trustees of the Univ. of Ala.*, No. 07-11729, 2007 U.S. App. LEXIS 28215, at *6 (11th Cir. Dec. 4, 2007); *see also Amro v. Boeing Co.*, No. 97-3049, 1998 U.S. App. LEXIS 15164, at *8 (10th Cir. July 8, 1998) ("With respect to his claim of discriminatory compensation, plaintiff may establish a prima facie case by showing that a co-worker outside the protected class performing similar work was compensated at a higher rate.").

To meet this bar, plaintiff has put forth evidence that under the terms of the CBA, 32 out of the 34 MIAA members received significantly higher percentage increases in salary than he did and that he is the only black, male principal in the group. He further points to another secondary school principal – a white male named Mr. Murphy – who received a higher salary than plaintiff, despite having less experience and educational background. Finally, plaintiff argues that the only person in the association who received a similar increase was the retiring union president, Brennan, who was not impacted by the contract because she received additional compensation in the summer. (Pl.'s Opposition, at 14.)

However, the full record is such that a reasonable finder of fact could not possibly find that plaintiff's salary increase was discriminatory based on his age, race, or gender. The statistical evidence and undisputed facts in this case simply do not support a *prima facie* case of discrimination. Specifically, the following facts show that plaintiff has failed to demonstrate that similarly situated counterparts received higher compensation, and/or that he was qualified to also receive a higher wage: (1) plaintiff was the highest paid member of the MIAA going

into the negotiations and the 13th highest paid junior high school principal in the county, while many of the other members were among the lowest paid in the county within their respective positions; (2) another black male – the only other black male member of the MIAA – received the highest salary increase of the group; (3) the other MIAA member with a similarly high salary and the same managerial level as plaintiff (since principals and directors are of the same management level) – who was a white female, the president of the MIAA, the second highest paid member of the MIAA after plaintiff, and the most senior administrator within MIAA – was treated the same as plaintiff, and there is no evidence that her retirement was foreseen at that time; (4) three of the other four black members of the MIAA received the top or near the top raises; (5) the seven other male members of the MIAA received high levels of increases, ranging from 36 to 43.5 percent, with the highest going to a black male (*see* MIAA Def.'s Ex. 10); (6) the white male high school principal whom plaintiff alleges receives a higher salary was hired after the CBA was negotiated and, moreover, actually had one of the lowest percentage increases (23.7 percent) and has a position that is distinguishable from plaintiff's in that he oversees one of the largest high schools in Suffolk County;[6] (7) MIAA's seven male administrators (excluding plaintiff), five black administrators (excluding plaintiff) and one

---

[6] In 2001, the ninth grade was removed from the junior high school and placed with the high school, adding approximately 750 more students to the high school, and the Longwood high school principal oversees one of the largest high schools in Suffolk County with over 3,000 students. (MIAA Def.'s 56.1 ¶¶ 41, 43.) Plaintiff, on the other hand, is principal of a smaller junior high school.

Hispanic administrator all received higher percentage increases, ranging from 33.2 to 43.5 percent (*id.*); and (8) two of the four members of the CBA negotiating team on behalf of the LCSD were males, one 56-year-old white female, and one 62-year-old black female principal. Based upon these undisputed facts, plaintiff has failed to set forth evidence to support a claim of disparate impact of the CBA on the basis of age, race, or gender (or any other claims for discrimination arising from the salary increase based on age, race, or gender).

Moreover, not only is there a lack of evidence of any disparate impact on those other MIAA members who are also black, older, or male, there is also no basis from which a rational juror could find that the record nonetheless supports plaintiff's argument that his *combination* of race, age, and gender makes him the subject of discrimination. In essence, plaintiff seems to argue that the fact that others of his race, age, or gender received higher percentage increases does not defeat his claim because these individuals are distinguishable based on other factors, such as experience and education. In this respect, plaintiff argues that he is not similarly situated to the other members of the MIAA because of his education level and years of experience and the fact that he is a principal and not an assistant principal. However, it is only plaintiff's race, age, or gender that is a prohibited basis of action by defendants; other factors, such as experience, education, and school demographics or responsibilities, are not. Thus, even setting aside the logical incongruity of plaintiff's position that he is nonetheless entitled to the same pay increases as these other MIAA members, defendants' agreement to subject plaintiff to lesser pay increases because of his high level of pay,

which may be based in part on his education level, position, and years of experience, is not discrimination that is prohibited by Title VII or ADEA and, therefore, not actionable.

Even assuming *arguendo* that plaintiff had set forth sufficient evidence to meet his *prima facie* burden, defendants have sufficiently met their burden in response to articulate a legitimate, non-discriminatory reason for implementing the 12-step pay schedule and placing plaintiff on the twelfth step. Gerstenlauer testified that the MIAA and LCSD entered into a 12-step structure that departed from prior contracts because of a recognition on their parts of a dire need to fix a salary scale that resulted in extraordinary low salaries for most administrators in the LCSD. (Pl.'s LCSD 56.1 ¶ 44.) The use of the BOCES salary survey information is confirmed by the affidavits of the MIAA chief negotiator and team members. (MIAA Def.'s Exs. 3-6.) Specifically, the salary survey indicated that: the four elementary school principals ranked 116th, 121st, 121st, and 155th out of 158 elementary school principals in the county; two out of four MIAA middle school assistant principals ranked 69th and 72nd out of 72 assistant principals in the county; six high school assistant principals ranked 88th, 102nd, 102nd, 102nd, 102nd and 109th out of 110 high school assistant principals in the county; and the seven assistant elementary principals were the lowest paid in the county, ranking 49th, 52nd, 52nd, 54th, 54th, 56th, and 56th out of 56 total. (MIAA Def.'s Ex. 8.) LCSD's middle school principal was the lowest ranked in the county, while in comparison, plaintiff ranked 13th within this group. (*Id.*) Gerstenlauer also testified that, in negotiating the CBA, the LCSD wanted fewer steps so that salaries would not press against those of senior management. (LCSD Def.'s 56.1 ¶ 43.)

Thus, defendants have set forth evidence that the negotiations were undertaken to correct the salary scale of MIAA administrators to increase the salaries of lower level administrators without inflating the salaries of upper level management, such as plaintiff. (Gerstenlauer Dep., at 51-52.) Because the CBA step schedule was constructed around the existing salary structure, plaintiff's existing high salary placed him in the highest step within his category, and, because assistant superintendent salaries for 2005-06 were up to $145,000, and plaintiff's salary was $141,296 at that time (MIAA Def.'s 56.1 ¶ 51), his salary was not subject to the same pay increases as those of other MIAA members.

To rebut this evidence as mere pretext for discriminatory animus, plaintiff argues that "even if Defendants wished to make salaries more competitive, it could have been accomplished without discriminating against Plaintiff. Defendants should have negotiated for a 15-step salary schedule or placed Plaintiff in the secondary principal category, in which Plaintiff would have been on Step 8. Instead, Defendants chose to single out Plaintiff, and give Plaintiff a substantially lesser salary percentage increase over the life of the 2006-2011 CBA." (Plaintiff's Opposition, at 16.) As an initial matter, plaintiff's mere disagreement with the terms of or the number of steps in the salary schedule is not a basis for a discrimination claim, without evidence that such was implemented to adversely impact plaintiff because of his age, race, or gender, which the Court has already determined is not supported in any way by the record. In other words, plaintiff's dissatisfaction with the number of steps ultimately agreed upon in the CBA, whether by reference to prior CBA contracts or the pay schedules of other districts, is insufficient to create a genuine issue of

material fact, where there is no evidence that the 12-step program was implemented to discriminate against plaintiff on the basis of his gender, age, or race. Furthermore, although plaintiff disputes the comprehensiveness of the BOCES survey data, plaintiff's disagreement with the methodology of the survey is insufficient to create a genuine issue of fact on discriminatory animus, where there is no evidence whatsoever that the information contained in that survey was used by defendants in a discriminatory fashion.

Finally, with respect to plaintiff's disagreement with his placement in the pay schedule relative to Mr. Murphy, it is undisputed that this high school principal whom plaintiff argues is similarly situated was hired after the CBA was signed and, thus, plaintiff cannot argue that he should have been grouped with this individual or that defendants treated plaintiff differently when they placed him within the 12-step schedule. In any event, plaintiff has not demonstrated that he is similarly situated to that individual. Simply put, plaintiff cannot simultaneously argue that the BOCES survey data is unreliable because it fails to take into account school size and demographics, but refuse to acknowledge that such differences may constitute a legitimate basis for differentiating himself from Murphy in terms of pay. Thus, plaintiff has failed to rebut defendants' proffered legitimate, non-discriminatory reasons for their actions, which stated that the CBA was designed to make the LCSD more competitive in terms of pay within the county, and that plaintiff was subject to lower salary increases because his initial salary was already high and because of concerns that his salary be proportional to his responsibilities and not exceed those of senior management, such as the assistant superintendents.

In sum, based on the record, a reasonable juror could not find that defendants' proffered reasons for changing the salary structure and for placing plaintiff on step 12 was discriminatory based on his age, race, or gender, where the undisputed evidence indicates (1) that those with inflated salaries, namely plaintiff and Brennan (a white female) and later Murphy (a white male), were the only ones affected adversely by the 12-step program through lower percentage increases in relation to other MIAA members, and (2) that plaintiff's fellow MIAA members, who were both male and female and white, black, and Hispanic, and of varying ages, all received higher percentage increases because they were all being paid relatively less at the time of the CBA negotiations, in both absolute amounts and in relation to their counterparts within Suffolk County, with the highest percentage increase going to a black male assistant principal. Because the Court finds that plaintiff has failed to establish a *prima facie* case of discrimination based on race, age, or gender and, alternatively, that plaintiff has not met his burden of providing evidence sufficient to raise an inference that defendants' proffered reasons are pretextual, the Court holds that summary judgment is warranted on plaintiff's claims against the LCSD defendants pursuant to Title VII and ADEA.

## B. Title VII and ADEA Claims Against the MIAA Defendants

The MIAA defendants argue that summary judgment on the Title VII and ADEA claims is warranted because MIAA does not qualify as a "labor organization" as defined under those statutes. These defendants contend, in the alternative, that such claims cannot survive summary judgment because plaintiff has not

demonstrated discriminatory animus.[7] For the reasons set forth below, the Court agrees.

### 1. Labor Organization

First, the Court determines that the Title VII and ADEA claims against the MIAA defendants fail as a matter of law because plaintiff has not established that MIAA is a "labor organization" within the meaning of Title VII or ADEA.[8]

Title VII makes it unlawful for an employer or labor organization "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. §§ 2000e-2(a), (c). Here, plaintiff is seeking to sue defendant MIAA as a "labor organization" under Title VII and not as an employer. Title VII defines a labor organization, in relevant part, as "a labor organization engaged in an industry affecting commerce . . . which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours . . . ." 42 U.S.C. § 2000e(d). The plaintiff bears the burden of demonstrating the requisite nexus between the defendant and interstate commerce. *See, e.g.*, *Fraser v. Pa. State Sys. of Higher Educ.*, No. CIV. A. 92-6210, 1994 WL 242527, at *10 (E.D. Pa. June 6, 1994). Plaintiff can meet this burden by either (1) demonstrating that MIAA is itself engaged in an industry affecting commerce – that is, that MIAA is engaged in an "activity, business or industry in commerce or in which a labor dispute would hinder or obstruct commerce or the free flow of commerce . . .[,]" 42 U.S.C. § 2000e(h), or (2) showing that MIAA is a labor organization deemed to be engaged in an industry affecting commerce within the meaning 42 U.S.C. § 2000e(e). *See Fraser*, 1994 WL 242527, at *10.

As an initial matter, the Court finds that MIAA is not itself engaged in an industry in commerce for the purposes of Title VII and ADEA. The MIAA's membership consists of 34 public school administrators on Long Island, and a labor dispute involving its members cannot arguably hinder or obstruct commerce. *See, e.g., Fraser*, 1994 WL 242527, at *10 (holding that defendant union is not a covered entity under Title VII); *Saini v. Bloomsburg Univ. Faculty*, 826 F. Supp. 882, 887 (M.D. Pa. 1993) (holding that defendant union was not a covered entity, where its members were university faculty). Thus, MIAA, on its own, cannot be considered a labor organization subject to Title VII.

Accordingly, the key issue with respect to MIAA is whether it may be deemed to be "engaged in an industry affecting commerce" as set forth by 42 U.S.C. § 2000e(e) and in particular, subparagraph (4) of that section. One of the ways that a plaintiff can satisfy the burden of demonstrating the requisite nexus to interstate commerce is by proving under subparagraph (4) of 42 U.S.C. § 2000e(e) that "the local labor organization does not itself satisfy the requirement of representing employees of an employer engaged in an industry affecting commerce, yet that local

---

[7] The MIAA defendants also argue that plaintiff has not demonstrated that he suffered from an "adverse employment action" within the meaning of Title VII. For the reasons discussed *supra*, the Court rejects this proposition.

[8] The ADEA uses the same terminology as Title VII for labor organization.

has been chartered by either a national or international labor organization which does satisfy the requirement." *Rainey v. Town of Warren,* 80 F. Supp. 2d 5, 14 (D.R.I. 2000). In this respect, plaintiff argues that MIAA is affiliated with CAS, which in turn is affiliated with ESSAA. Regardless of whether or not MIAA is in fact affiliated with CAS or ESSAA, it is undisputed that those entities represent administrators only within New York State. Thus, even if plaintiff had established a sufficient nexus between MIAA and CAS and/or ESSAA, plaintiff has presented no evidence that CAS or ESSAA are national or international labor organizations, much less ones that also meet the requirements of subsection (1) or (2), such that MIAA may be considered a labor organization for the purposes of Title VII or ADEA.

Furthermore, plaintiff's arguments that ESSAA is engaged in aspects of inter-state commerce through its affiliation with the ROSOL Insurance Agency, which purportedly sells disability and other insurance in several states including Connecticut and New Jersey, and that CAS has "business affiliations" with 1-800 Flowers, Davis Optical, automotive connections through AVIS Worldwide, as well as short and long term group life insurance companies, is equally unavailing to satisfy the interstate commerce requirement for the purposes of Title VII. (*See* Pl.'s Opposition, at 3.) The Court finds that these facts which plaintiff points to, even if true, are far from sufficient to establish that MIAA, as an affiliate of these organizations, is engaged in an industry affecting commerce, as defined by 42 U.S.C. § 2000e(e). Plaintiff points to no statutory or legal authority suggesting that the business affiliations of a local labor organization, which, in turn, is affiliated with the subject local labor organization – since

these alleged business affiliations are those of CAS and ESSAA and not MIAA – may constitute a valid basis for deeming a local labor organization "engaged in an industry affecting commerce" for the purposes of Title VII or ADEA. Instead, a fair reading of the statute indicates that plaintiff's position is untenable because the inquiry focuses on the industry engaged in by the employers of the chartering organization's member employees – which, in this case, is education – as opposed to the business affiliations or activities of the chartering labor organization and/or whether such business affiliates are themselves engaged in an industry affecting commerce.[9]

---

[9]  Section 42 U.S.C. § 2000e(e) provides that under Title VII a "labor organization" will be considered "engaged in an industry affecting commerce" based upon the following criteria:

> A labor organization shall be deemed to be engaged in an industry affecting commerce if (1) it maintains or operates a hiring hall or hiring office which procures employees for an employer or procures for employees opportunities to work for an employer, or (2) the number of its members (or, where it is a labor organization composed of other labor organizations or their representatives, if the aggregate number of the members of such other labor organization) is (A) twenty-five or more during the first year after March 24, 1972, or (B) fifteen or more thereafter, and such labor organization --
>
> (1) is the certified representative of employees under the provisions of the National Labor

In short, plaintiff's argument is without a legal basis as presented and too attenuated to create an issue of material fact. For these reasons, the Court finds that plaintiff's claims against the MIAA defendants fail as a matter of law

---

Relations Act, as amended [29 U.S.C. A. § 151 et seq.], and the Railway Labor Act, as amended [45 U.S.C.A. § 151 et seq.];

(2) although not certified, is a national or international labor organization or a local labor organization recognized or acting as the representative of employees of an employer or employers engaged in an industry affecting commerce; or

(3) has chartered a local labor organization or subsidiary body which is representing or actively seeking to represent employees of employers within the meaning of paragraph (1) or (2); or

(4) has been chartered by a labor organization representing or actively seeking to represent employees within the meaning of paragraph (1) or (2) as the local or subordinate body through which such employees may enjoy membership or become affiliated with such labor organization; or

(5) is a conference, general committee, joint or system board, or joint council subordinate to a national or international labor organization, which includes a labor organization engaged in an industry affecting commerce within the meaning of any of the preceding paragraphs of this subsection.

42 U.S.C. § 2000e(e).

under Title VII and ADEA because the undisputed facts demonstrate that MIAA is not a "labor organization" within the meaning of Title VII or ADEA.

2. Breach of Duty of Fair Representation

Even assuming *arguendo*, however, that plaintiff's Title VII and ADEA claims may proceed on the basis of MIAA's status as a labor organization within the meaning of those statutes, the Court finds that these claims cannot survive summary judgment because plaintiff has not put forth sufficient evidence to create a genuine issue of material fact as to support a finding by a rational jury of a breach of the duty of fair representation.

Under Title VII, it is unlawful for a labor union "to exclude or to expel from its membership, or otherwise discriminate against, any individual because of his race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(c)(1). Any claim against MIAA under Title VII or the ADEA must arise from its duty of fair representation. *See, e.g., Nweke v. Prudential Ins. Co. of Am.*, 25 F. Supp. 2d 203, 220 (S.D.N.Y. 1998) ("It has been held that in order to establish a Title VII claim concerning representation by a union of its members' interests, 'it is axiomatic that . . . there must first be a finding that the [union] breached its duty of fair representation.'") (quoting *Martin v. Local 1513 & District 118 of the Int'l Ass'n of Machinists and Aerospace Workers,* 859 F.2d 581, 584 (8th Cir. 1988)).

"[A] test applied frequently in this Circuit which is sometimes referred to as the "'*Bugg* test'" applies to this claim and stems from a decision from the Seventh Circuit Court of Appeals. *See Agosto v. Corr. Officers Benevolent Ass'n,* 107 F. Supp. 2d 294, 304 (S.D.N.Y. 2000). Under this test, in order to

establish a claim under Title VII for a breach of its duty of fair representation due to discriminatory reasons, a plaintiff must show the following: (1) that the employer violated the collective bargaining agreement; (2) that the union allowed the violation to go unrepaired, thereby breaching its duty of fair representation; and (3) that the breach by the union was motivated by discriminatory animus. *See Bugg v. Int'l Union of Allied Indus. Workers, Local 507,* 674 F.2d 595, 598 n.5 (7th Cir. 1982); *accord Daniels v. Niagara Mohawk Power Corp.,* No. 04-CV-0734S, 2007 WL 925759, at *6 (W.D.N.Y. Mar. 26, 2007); *Schaefer v. Erie County Dep't of Soc. Servs. & CSEA Local 815,* 82 F. Supp. 2d 114, 118 (W.D.N.Y. Jan. 26, 2000); *Ross v. Commc'n Workers Am., Local 1110,* 91 Civ. 6367, 1995 U.S. Dist. LEXIS 7959, at *19-20 (S.D.N.Y. June 9, 1995), *aff'd,* 100 F.3d 944 (2d Cir. 1996). Plaintiff appears to base his arguments upon this test; however, there was no violation of the CBA by the LCSD defendants that has been alleged here, which is fatal to plaintiff's claim under this test.[10]

Instead, the gravamen of plaintiff's claim is that the MIAA violated its duty of fair representation to plaintiff in negotiating the 2006-11 CBA. As the court in *Agosto* acknowledged, the *Bugg* test, which arose in the context of an alleged breach of a collective bargaining agreement, is likely too narrow a statement of the law. *See id.* at 304-05 ("courts in this Circuit, although citing the first element of the *Bugg* test, have not generally found it necessary to apply it"). Thus, more generally, in order to establish a race-based discrimination claim against a union concerning its representation of a member's interests, the plaintiff must show that the union breached its duty of fair representation and that it did so on the basis of the member's race, color, religion, sex, or national origin. *See, e.g., Smith v. New Venture Gear, Inc.,* No. 5:00-CV-1151, 2008 WL 200015, at *25 (N.D.N.Y. Jan. 22, 2008); *Agosto,* 107 F. Supp. 2d at 304; *Nweke,* 25 F. Supp. 2d at 220. "The duty of fair representation requires a union 'to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.' A union breaches this duty when its actions are 'arbitrary, discriminatory, or in bad faith.'" *Agosto,* 107 F. Supp. 2d at 303 (quoting *Air Line Pilots Ass'n Int'l v. O'Neill,* 499 U.S. 65, 67, 76 (1991)); *accord New Venture Gear,* 2008 WL 200015, at *25.

Regardless of what test is used, plaintiff must show that the union's actions were motived by discriminatory animus or were discriminatory in nature. Plaintiff has failed to do so here, for the reasons discussed at length *supra* in connection with plaintiff's discrimination claims against the LCSD defendants. Thus, the Court finds that plaintiff has failed to set forth evidence showing that the union's actions in negotiating the CBA, or their alleged failure to "repair" that alleged violation, were motivated by discriminatory animus or resulted in disparate impact. *See Agosto,* 107 F. Supp. 2d at 305 ("[E]ven the third element of the *Bugg* test is flawed. To the extent that

---

[10] Specifically, plaintiff alleges that the *MIAA defendants* (rather than the LCSD defendants) violated the CBA provision requiring it to represent all members equally without discrimination on the base of race, creed, color, national origin, sex or marital status, among others. (Plaintiff's Opposition, at 6-7.) Further, plaintiff contends that MIAA did not correct the violation despite plaintiff's attempts to resolve it. (Plaintiff's Opposition, at 7.)

it requires a union's actions to be motivated by discriminatory animus, it is inapplicable to claims against a union under a disparate impact theory of discrimination."). In particular, plaintiff has relied on nothing more than statistical evidence that demonstrates that those MIAA members with high levels of percentage increases in salary were of varying race, gender, and age, and thus the undisputed evidence belies his claim. It is also undisputed that MIAA attempted to negotiate a schedule with more steps, but this was rejected by the LCSD, and that the union had previously provided plaintiff with representation in connection with the race-based accusations in his 2004 EEOC complaint. Based on these undisputed facts, no reasonable juror could find that the evidence raises an inference that the alleged failure by the MIAA defendants to procure a higher salary increase on the part of plaintiff was motivated by discriminatory animus or that the MIAA defendants' actions were discriminatory, nor is there any evidence that the MIAA defendants breached their duty of fair representation in any way. Accordingly, summary judgment dismissing these claims is warranted.

## C. Section 1981 Claim

Plaintiff also asserts a cause of action under 42 U.S.C. § 1981. Section 1981 prohibits intentional race-based discrimination in the workplace. *See Anderson v. Conboy*, 156 F.3d 167, 170 (2d Cir. 1998); *see also Turner v. Nat'l R.R. Passenger Corp.*, 181 F. Supp. 2d 122, 126 (N.D.N.Y. 2002). Section 1981 claims are analyzed under the same standards as Title VII claims. *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000). As set forth *supra*, the plaintiff has not adequately supported a Title VII discrimination claim based on race and,

therefore, the plaintiff also fails to support a cause of action against these defendants under Section 1981.[11] Moreover, because plaintiff must establish that the MIAA breached its

---

[11] Moreover, although individual liability may arise under §§ 1981 and 1983 upon a showing that the individual defendants were personally involved or participated in the violation, *see, e.g.*, *Patterson*, 375 F.3d at 226; *Tekula v. Bayport-Blue Point Sch. Dist.*, 295 F. Supp. 2d 224, 229 (E.D.N.Y. 2003), plaintiff has provided insufficient support for his allegation that Brennan was personally involved or participated in the alleged violation of plaintiff's civil rights to withstand summary judgment on this issue. In fact, plaintiff concedes that he has no knowledge of whether Brennan was involved in the CBA negotiations at all or was present for them. The members of MIAA's negotiating team and Gerstenaluer testified that Brennan had no personal role or involvement in the negotiations of the CBA and was not involved in the creation, development, or placement of individuals on the salary schedule. Although plaintiff claims that Brennan testified that she had discussions regarding the CBA negotiations, the pages of Brennan's deposition that are cited by plaintiff do not support such a characterization. In fact, Brennan testified that she was informed by the chief negotiator at the conclusion of the negotiations that they had reached an agreement and that she did not discuss the contract with anyone prior to signing it. (Brennan Dep., at 13, 21.) She further testified that she was not aware that plaintiff received a lower increase in pay until after the contract was resolved. (Brennan Dep., at 43.) Defendants have put forth evidence that Brennan was not involved in the negotiations, and, as plaintiff cannot counter this evidence to create a disputed issue of material fact on Brennan's personal involvement in implementing the 12-step pay schedule or placing plaintiff within the schedule, summary judgment on the Section 1981 and 1983 claims against Brennan is appropriate. In any event, there is no evidence to support any claim of race-based discrimination by Brennan.

duty of fair representation by discriminating against plaintiff on the basis of his race in order to sustain a Section 1981 claim, *see Nweke*, 25 F. Supp. 2d at 221, this claim is also dismissed with respect to the MIAA defendants, for the reasons discussed *supra*.

## D. Section 1983 Claim

Plaintiff also asserts a cause of action under 42 U.S.C. § 1983 based upon the alleged discriminatory conduct by defendants MIAA and Brennan, acting in concert with the LCSD. This claim must also be dismissed with respect to all defendants, as set forth below.

Under Section 1983, a plaintiff must show: (1) the deprivation of any rights, privileges or immunities secured by the Constitution and federal law, (2) by a person acting under the color of state law.[12]  42 U.S.C. § 1983. Section 1983 does not itself provide substantive rights, but in fact offers "a method for vindicating federal rights elsewhere conferred." *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 225 (2d. Cir.

---

[12]  Section 1983 provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.

2004) (quoting *Baker*, 443 U.S. at 144 n.3); *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) ("Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere.") (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)). "'A Title VII plaintiff is not precluded from bringing a concurrent § 1983 cause of action,' such as a claim for denial of equal protection, 'so long as the § 1983 claim is based on a distinct violation of a constitutional right.'" *Patterson*, 375 F.3d at 225 (quoting *Gierlinger v. N.Y. State Police*, 15 F.3d 32, 34 (2d Cir. 1994) and citing *Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 143 (2d Cir. 1993)).

Plaintiff asserts violations of his rights under the Equal Protection Clause of the Fourteenth Amendment, which provides that "no State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. To state a claim of discrimination under the Equal Protection Clause, a plaintiff must allege that a government actor intentionally discriminated against him on the basis of his membership in a protected class. *Linder v. City of N.Y.*, 263 F. Supp. 2d 585, 592 (E.D.N.Y. 2003) (citing *Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000)).

The Equal Protection Clause of the Fourteenth Amendment is "essentially a direction that all persons similarly situated be treated alike." *Latrieste Rest. v. Vill. of Port Chester*, 188 F.3d 65, 69 (2d Cir. 1999) (quoting *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985)). To prevail on this claim, plaintiff must show that (1) he was treated differently from similarly situated individuals; and (2) that "such differential

treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 790 (2d Cir. 2007) (quoting *Harlen Assocs.*, 273 F.3d at 499).

Again, for the reasons discussed *supra*, plaintiff has failed to set forth evidence that he was treated differently from similarly situated individuals, on the basis of his membership in a protected class.[13] Therefore, summary judgment on plaintiff's Section 1983 claim against LCSD and Gerstenlauer is appropriate. Moreover, in order to show that MIAA was acting "under color of state law," plaintiff must show that they conspired with the school district to deprive plaintiff of his equal protection rights. *See Dennis v. Sparks*, 449 U.S. 24, 27-28 (1980). To defeat a defendant's motion for summary judgment, plaintiffs must present sufficient evidence to support an inference that an improper conspiracy took place. *See McGovern v. Local 456, Int'l Bhd. of Teamsters, Chauffeurs & Warehousemen & Helpers of Am.*, 107 F. Supp. 2d 311, 316-17 (S.D.N.Y. 2000). Plaintiff has pointed to no evidence to suggest that MIAA conspired with LCSD to deprive plaintiff of his equal protection rights, in any event. Indeed, "[MIAA's] only 'collaboration' with the [LCSD] arose from the negotiation of an agreement for the bargaining unit. Mere negotiation in the course of completing a collective bargaining agreement does not rise to the level of an improper conspiracy. In fact, the Union's role in relation to the [LCSD] was adversarial."

*McGovern*, 107 F. Supp. 2d at 317. Therefore, summary judgment on plaintiff's Section 1983 claim against the MIAA defendants is also warranted on that ground.[14]

IV. CONCLUSION

For the reasons set forth herein, defendants' motions for summary judgment are granted in their entirety against all claims and the complaint is dismissed in its entirety. The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: September 30, 2009
Central Islip, NY

* * *

Plaintiff Dr. Levi McIntyre is represented by Steven A. Morelli, Esq., of Leeds, Morelli & Brown, P.C., 1 Old Country Road, Suite 347, Carle Place, NY 11514. The attorney for defendants MIAA and Kathleen Brennan is Bradford A. Stuhler, Esq., 490 Wheeler Road Suit 280, Hauppauge, NY 11788. The attorney for defendants LCSD and Dr. Allan Gerstenlauer are Rondiene Erin Novitz, Esq. and Gary E. Dvoskin, Esq., of Cruser, Mitchell & Novitz, LLP, 175 Pinelawn Road, Suite 301, Melville, NY 11747.

---

[13] As pointed out by defendants, a "class of one" theory of discrimination in the public employment context is not cognizable under *Enquist v. Oregon Department of Agriculture*, 128 S.Ct. 2146 (2008).

[14] As the Court finds dismissal of all of plaintiff's claims warranted, it need not address the collateral estoppel argument as set forth by the LCSD defendants.